UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| JACQUELYN DAVIS, INDIVIDUALLY, AND AS PARENT AND NATURAL GUARDIAN OF MCKENZIE DAVIS, | § § § § § § | CIVIL ACTION FILE NO._____ |
| PLAINTIFFS, | § § | |
| V. | § § | |
| THE UNITED STATES OF AMERICA, | § § § | |
| DEFENDANT. | § § | |

### ORIGINAL COMPLAINT FOR DAMAGES
### UNDER THE FEDERAL TORT CLAIMS ACT

COMES NOW Jacquelyn Davis ("Plaintiff" or "Ms. Davis"), individually, and as parent and natural guardian of McKenzie Davis ("McKenzie"), by and through her undersigned counsel, Weinstock & Scavo, PC, and states her Complaint against Defendant United States of America as follows:

### JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

1.

Plaintiff Jacquelyn Davis and her daughter, McKenzie Davis ("McKenzie"), live at 1155 Churchill Downs Road, Atlanta, GA 30319 and thus are residents of the Northern District of Georgia.

2.

The claims herein are brought against the United States pursuant to the Federal Tort Claims Act (28 U.S.C. §2671, *et seq.*) and 28 U.S.C. §1346(b)(1), for money damages as compensation for personal injuries that were caused by the negligent and wrongful acts and omissions of employees of the United States Government while acting within the course and scope of their offices and employment, under circumstances where the United States of America, if a private person, would be liable to the Plaintiff in accordance with the laws of the State of Georgia.

3.

Venue is proper in that Ms. Davis and McKenzie are residents of the Northern District of Georgia and all, or a substantial part of the acts and omissions forming the basis of these claims occurred therein.

4.

Plaintiff has fully complied with the provisions of 28 U.S.C. § 2675 of the Federal Tort Claims Act.

5.

This suit has been timely filed, in that Plaintiffs timely served notice of their claims on The United States Army on July 29, 2008, and April 6, 2009. The U.S.

Army Claims Service assumed responsibility for evaluating these claims and rendering a decision; however, after more than two years and repeated requests for a final determination, no decision was ever rendered by the government.

6.

Accordingly, Plaintiff has chosen to treat the failure to respond as a denial pursuant to 28 USCA § 2675.

7.

A copy of the Summons and Complaint may be served upon the Attorney General of the United States in Washington, DC and upon the United States Attorney for the Northern District of Georgia.

## EVENTS FORMING THE BASIS OF THE CLAIMS ON BEHALF OF MCKENZIE DAVIS

8.

Ms. Davis and Charles Shrum were married on December 12, 2005.

9.

At the time, Charles Shrum was a Sergeant with the United States Army.

10.

Sergeant Shrum ("Sgt. Shrum") was assigned to both Ft. McPherson and Ft. Gillem in the metropolitan Atlanta area.  Sgt. Shrum and Ms. Davis lived off base.

11.

It is clear from Sgt. Shrum's medical records that, as early as December of 2003, he was prescribed Methotrexate to treat Rheumatoid Arthritis and inflammatory bowel disease. Sgt. Shrum was also taking Oxycodone, Ambien, Loperamide, Fosamax and Amitryptline during the years 2005 and 2006.

12.

Methotrexate is classified as a Pregnancy X drug based upon its toxic effects on the embryo and fetus.

13.

There is no "safe" period of gestational exposure and the overall dose effect of Methotrexate on the fetus is totally unpredictable. As with the case of Thalidomide, Methotrexate is found in the semen, plasma, breast milk, placenta and fetal tissues.

14.

Sgt. Shrum's minimal dose was 7.5 mg/wk. (three 2.5 mg tablets) and over the years, including 2005 and 2006, his dose was raised to 4 tabs (10mg/wk), 6 tabs/wk (12mg/wk), 7 tabs/wk (15mg/wk) and as per some records, reportedly as high a dose as 25mg/week.

15.

The records indicate that most, if not all, Methotrexate treatment was under the direction of Drs. Malloy and Fincher, physicians at D.D. Eisenhower Army Medical Center in Fort Gordon, Georgia.

16.

In late December of 2005, Ms. Davis became pregnant with McKenzie.  Sgt. Shrum is McKenzie's biological father.

17.

Dr. Malloy wrote prescriptions for Methotrexate throughout 2004, 2005, 2006 and up to and including January 29, 2007.

18.

Specifically, prescriptions were written 5-9 days before the day of Ms. Davis' last normal menstrual period, 8 days before conception, and 24 days after the birth of McKenzie on August 8, 2006.  Prescriptions were written in March, May, July and September of 2006,

19.

Thus, Sgt. Shrum was taking Methotrexate before, during and after the first trimester of Ms. Davis' pregnancy, including the most critical time of 5-9 weeks of gestation.

20.

On August 8, 2006, Ms. Davis gave birth to McKenzie.

21.

McKenzie was born with severe micrognathia as well as being severely hypoplastic and having a non-functioning tongue.

22.

McKenzie has also had mandibular distraction and nasal stents performed in 2006, a secondary distraction performed in October of 2007, and had a tracheostomy placed in September of 2006.

23.

McKenzie has also been diagnosed with Pierre-Robin Syndrome and has undergone more than one fundoplication.

24.

McKenzie has also been diagnosed with failure to thrive syndrome.

25.

McKenzie has also been diagnosed with tracheostomy dependence, gastroesophoageal reflux disease, gastronomy tube dependence, approxia, developmental delay, correctional vision, scalp, buttocks and abdominal hemangiomas and hypoglycemia with off-set gastrointestinal issues.

- 6 -

26.

McKenzie will also require extensive dental work, a potential tongue transplant and an Alcom communication device.

27.

Sgt. Shrum's consumption of Methotrexate caused the various birth defects from which McKenzie suffers as described above.

## EVENTS FORMING THE BASIS OF THE CLAIMS ON BEHALF OF JACQUELYN DAVIS INDIVIDUALLY AND AS PARENT AND NATURAL GUARDIAN OF MCKENZIE DAVIS

28.

Plaintiff hereby realleges and reincorporates every paragraph, allegation and count of this Complaint contained in Paragraphs 1 through 27 as if fully set forth herein.

29.

Shortly after their wedding, Sgt. Shrum became increasingly violent towards Ms. Davis.

30.

In fact, six days after the wedding, Sgt. Shrum shot and fatally wounded their dog. He repeatedly threatened Ms. Davis that he would do the same to her.

31.

During the early months of 2006, Sgt. Shrum frequently and continually beat, injured and raped Ms. Davis.

32.

In late February/early March of 2006, Ms. Davis met with Sgt. Shrum's superior officer, Captain Jerry Clausen ("Capt. Clausen") in order to tell him about Sgt. Shrum's violent episodes.   Capt. Clausen was aware that Ms. Davis was pregnant at the time.

33.

Ms. Davis told Capt. Clausen on at least three more occasions during March and April that the physical and sexual abuse continued.   On each occasion, Capt. Clausen assured Ms. Davis that the Army would address the situation internally and repeatedly asked her not to report the situation to civilian police.   Ms. Davis complied with this request.

34.

In late April, Ms. Davis met with Lieutenant Colonel Tribotti ("Lt. Col. Tribotti") and Capt. Clausen at a softball game.   At the time, Ms. Davis had a black eye and swollen lip from the beatings.

35.

Ms. Davis, once again, told Lt. Col. Tribotti and Capt. Clausen of Sgt. Shrum's violence and sexual abuse and further notified Lt. Col. Tribotti that she was pregnant.

36.

Lt. Col. Tribotti assured Ms. Davis that the Army would address the situation internally (by "grabbing real estate" and keeping it "in-house") and repeatedly asked her not to report the situation to civilian police.  Ms. Davis complied with this request.

37.

Upon information and belief, in late April or early May of 2006, Capt. Clausen personally witnessed as Sgt. Shrum slammed Ms. Davis' face into the steering wheel of her car.

38.

Despite the assurances from Lt. Col. Trebotti and Capt. Clausen, Sgt. Shrum continued to physically and sexually abuse Ms. Davis throughout April and May of 2006 and no steps were taken to stop the violence.

39.

Sometime around May of 2006, Ms. Davis went to a military social worker (name unknown) to seek help. The social worker said that she had to go through the chain of command and then she would help Ms. Davis move to a safe place and receive military benefits.

40.

Upon information and belief, this social worker was transferred to Hawaii before doing anything to help assist Ms. Davis.

41.

Around late May/early June, Ms. Davis met with Capt. Clausen again to ask him why nothing had been done to protect her and her unborn child.

42.

Once again, Capt. Clausen assured Ms. Davis that the situation would be addressed and repeated his direction not to contact the civilian police.

43.

In late June of 2006, Sgt. Shrum broke Ms. Davis' nose during an episode of physical violence.  Sgt. Shrum re-set the nose himself.

44.

In July of 2006, Sgt. Shrum dislocated Ms. Davis' jaw during yet another episode of physical violence.

45.

On the evening of July 31, 2006, Ms. Davis was once again severely beaten by Sgt. Shrum.  At the time of the beating, Sgt. Shrum was in full uniform and wearing military grade boots

46.

During this particular episode of physical violence, Sgt. Shrum kicked Ms. Davis so hard that it left an impression of a boot on Ms. Davis' leg which was so distinct that the medical staff that treated her ultimately recognized it as a boot print.

47.

As a result of this severe beating, Ms. Davis was diagnosed and treated with deep vein thrombosis (DVT) from her groin to her ankle.  Her condition was so severe that her leg nearly had to be amputated.

48.

The morning after the July 31, 2006 beating, Ms. Davis began experiencing leg pain, camping, numbness and contractions.

49.

Ms. Davis was diagnosed by her OB/GYN as being in premature labor. Accordingly, she was hospitalized from August 1, 2006 until August 11, 2006.

50.

Capt. Clausen and Lt. Col. Trebotti visited Ms. Davis in the hospital. Ms. Davis told them that the incident could have been prevented and once again begged for protection for herself and her unborn child.

51.

On August 8, 2006, Ms. Davis gave birth to a baby girl ("McKenzie"). During the birthing process, both Ms. Davis and McKenzie "coded" and had to be revived by the medical personnel.

52.

Due to complications, McKenzie had to be "life flighted" and Ms. Davis had to remain in the hospital for an additional four days.

53.

As a result of this incident, Ms. Davis will have to a wear compression hose for the rest of her life.

54.

Additionally, Ms. Davis had to have titanium rods inserted into her fallopian tubes.

55.

Ms. Davis also had to undergo an endometrial ablation and she will never be able to bear children again.

56.

After Ms. Davis' return from the hospital with McKenzie, Sgt. Shrum continued to engage in physical and sexual abuse toward Ms. Davis and made numerous threats of committing violence directed to their infant child.

57.

Ms. Davis repeatedly sought out Capt. Clausen and Lt. Col. Trebotti and plead for assistance/protection.

58.

In November of 2006, Sgt. Shrum attempted to kill their infant child by occluding her tracheotomy tube.

59.

On or about December 6, 2006, Ms. Davis met with Lt. Col. Trebotti and Capt. Clausen to discuss the continuing violence and sexual abuse.  She brought evidence of same to the meeting.

60.

Lt. Col. Trebotti was the Provost Marshall of the Ft. McPherson Military Police Unit throughout all relevant times hereto.

61.

Lt. Col. Trebotti again asked Ms. Davis not to go to the civilian police.  This time, however, Ms. Davis explained that she had no choice because she feared for her daughter's life.

62.

At that time, Lt. Col. Trebotti called Sgt. Shrum to the base under the premise that he was to work an accident.

63.

Upon arrival at the base, Sgt. Shrum's vehicle was searched.  Military Police found prescription drugs and a loaded handgun in violation of military law.

64.

Lt. Col. Trebotti told Ms. Davis that Sgt. Shrum would be detained for 48 hours so that Ms. Davis could get to a safe place.  Upon information and belief, he was released prior to the 48 hour deadline.

65.

Lt. Col. Trebotti also (finally) issued a Military Protective Order providing that Sgt. Shrum was not to make contact with Ms. Davis or their infant child McKenzie.

66.

A domestic violence counselor, Regina Coleman, was called in to assist Ms. Davis.

67.

Ms. Coleman told Ms. Davis that she would help move Ms. Davis to a safe building and would assist Ms. Davis in obtaining any benefits that the United States Army provides to battered wives.

68.

Despite the promises that she made, Ms. Coleman did not help Ms. Davis in any manner after their initial meeting.

69.

Ms. Davis moved a limited amount of her belongings to her parents' house and slept in the hospital with her daughter McKenzie.

70.

The hospital, on its own accord, moved Ms. Davis and McKenzie to a room with heightened security and changed the names on the door.

71.

Captain Mullette ("Capt. Mullette") and ("Sgt. Carr) were ordered to investigate Ms. Davis' domestic violence claims.

72.

Capt. Mullette and Sgt. Carr instructed Ms. Davis to secure all weapons and keep them in her possession.   When securing the weapons, Ms. Davis found several with the serial numbers scratched off.

73.

Several days later, Sgt. Shrum contacted Ms. Davis in direct violation of the MPO.

74.

Ms. Davis informed Capt. Mullette of the violation and asked that Sgt. Shrum be transferred for her safety and the safety of her daughter. Captain Mullette refused.

75.

Fearing for her safety, Ms. Davis finally went to the Henry County Police Department domestic violence unit to seek protection.

76.

Henry County Police officers arrested Sgt. Shrum on charges of domestic violence. Henry County Police Officers also served Sgt. Shrum with a Temporary Protective Order.

77.

On December 12, 2006, Henry County Superior Court Judge Arch McGarity ordered a permanent restraining order and terminated Sgt. Shrum's parental rights to McKenzie.

78.

Ms. Davis has had to undergo anterior and posterior capsular reconstruction, and a related breast reduction surgery due to the numerous occasions upon which Sgt. Shrum dislocated her shoulder and/or broke her collarbone.

79.

The violence inflicted upon Ms. Davis has resulted in permanent injuries, surgical procedures and scarring in addition to physical and emotional pain and suffering.

80.

Due to the negligent acts and/or omissions of the United States employees mentioned above, Ms. Davis has suffered, and continues to suffer financial hardship as well as severe physical and mental pain and suffering.

## COUNT I: PROFESSIONAL NEGLIGENCE AGAINST ARMY MEDICAL PERSONNEL

81.

Plaintiff hereby realleges and reincorporates every paragraph, allegation and count of this Complaint contained in Paragraphs 1 through 82 as if fully set forth herein.

82.

The standard of care with Class X drugs such as Methotrexate requires the following:

(a)     Two pregnancy tests, 2 weeks apart, must be obtained before either partner starts therapy.

(b)     Monthly pregnancy tests should be carried out after onset of treatment as well as for 6 months after cessation of therapy (washout period).

(c)     A pregnancy test should be immediately obtained in the case of irregular bleeding or a menstrual period delayed by over 3 days.

(d)     Informed Consent must be obtained from both potential partners or spouses, whatever the particular case may be.

83.

Drs. Malloy and Fincher and/or any other medical providers at D.D. Eisenhower Army Medical Center at Fort Gordon and/or any other Army medical center or facility, failed to give adequate instructions or warnings to either Sgt. Shrum or Ms. Davis as to the potential dangers to a fetus when taking Methotrexate and also the dangers of engaging in sexual intercourse while a man is taking Methotrexate.

84.

Ms. Davis as spouse and the sexual partner of Sgt. Shrum, or as an expectant mother, never had any knowledge nor received any warnings of the dangers of Methotrexate to her unborn child.

85.

Dr. Malloy, Dr. Fincher and/or any and all other medical providers at D.D.

Eisenhower Army Medical Center at Fort Gordon and/or any other Army medical center or facility failed to administer pregnancy tests either prior to, or during, the consumption of Methotrexate.

86.

Furthermore, Ms. Davis' informed consent was not obtained at any time prior to or during the pregnancy and the risks of Methotrexate were never explained to her at any time.

87.

Drs. Malloy and Fincher deviated from generally acceptable standards of a physician's care and failed to exercise that degree of skill and care ordinarily required by physicians working in this environment under like conditions and circumstances by:

(a)     Failing to properly warn Sgt. Shrum as to the dangers and risk of taking Methotrexate when getting married and possibly fathering a child; and

(b)     Failing to warn of the dangers of Methotrexate to Ms. Davis as spouse and the potential mother of any child.

(c)     Failing to administer pregnancy tests and/or discuss potential pregnancy/complications with Ms. Davis.

88.

Drs. Malloy and Fincher's deviations from the standard of care in failing to properly warn Sgt. Shrum and/or Ms. Davis of the dangers of exposure to Methotrexate proximately caused McKenzie, a minor child, to be born with numerous birth defects, most notably Pierre-Robin Syndrome, and the general pain and suffering associated with all of these conditions.   In addition, McKenzie has suffered well over one million dollars in special damages to date from Scottish Rite Hospital alone.  This amount will be supplemented during discovery.

89.

Plaintiff has attached hereto the Affidavit of Dr. Richard Nalick, an expert witness qualified to render opinions on the acts and/or omissions of negligence, professional malpractice and other deviations from the standard of care alleged in this case.  This Affidavit is hereby incorporated by reference, as if fully set forth herein.   Attached to this Affidavit is a copy of Dr. Nalick's Curriculum Vitae establishing his credentials and qualifications.

## COUNT II: NEGLIGENCE OF MILITARY COMMANDERS

90.

Plaintiff hereby realleges and reincorporates every paragraph, allegation and count of this Complaint contained in Paragraphs 1 through 89 as if fully set forth herein.

91.

Military commanders at every level have a duty to take appropriate steps to prevent domestic violence, protect victims, and hold those who commit it accountable.

92.

The Military Commanders described in the paragraphs above including, but not limited to, Capt. Clausen and Lt. Col. Trebotti breached their duty by failing to take appropriate steps to protect Ms. Davis and her infant child McKenzie.

93.

Despite numerous complaints and pleas for assistance, and with active knowledge of domestic violence being committed upon Ms. Davis by Sgt. Shrum, the Military Commanders failed and refused to take any steps to protect Ms. Davis and her infant child from domestic violence or even properly investigatethe allegations thereof.

94.

The negligent acts and omissions of the Military Commanders described above proximately caused Ms. Davis and McKenzie to needlessly suffer extensive and permanent physical and emotional pain and suffering.

## COUNT III: NEGLIGENCE OF ARMY SOCIAL WORKERS/OTHER PERSONNEL

95.

Plaintiff hereby realleges and reincorporates every paragraph, allegation and count of this Complaint contained in Paragraphs 1 through 93 as if fully set forth herein.

96.

The United States Army (and its employees) had a duty to pay Ms. Davis the benefits to which she is entitled as a battered wife of military personnel.

97.

The United States Army (and its employees) breached this duty by failing to pay Ms. Davis the benefits to which she is entitled as a battered wife of military personnel.

98.

This breach is the proximate cause of Ms. Davis not receiving the benefits to which she is entitled as a battered wife of military personnel.

99.

As a result of Defendant's negligence, Plaintiff is entitled to recover damages, including back-pay, in an amount to be proven at trial.

## COUNT IV: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

100.

Plaintiff hereby realleges and reincorporates every paragraph, allegation and count of this Complaint contained in paragraphs 1 through 98 as if fully set forth herein.

101.

The negligence described in the preceding paragraphs resulted in beatings, rapes and other physical impacts to the plaintiff.

102.

The impacts caused physical injury to the Plaintiff as described above.

103.

Defendant's negligence is the sole and proximate cause of the emotional anguish and physical distress which Plaintiff has suffered and from which she continues to suffer.

104.

Plaintiff is entitled to recover damages from Defendant in an amount to be proven at trial.

105.

As a result of the physical injuries to Plaintiff, which were proximately caused by Defendant's negligence, Plaintiff has suffered extensive mental suffering and emotional distress.  Defendant is therefore the proximate cause of Plaintiff suffering extensive mental suffering and emotional distress.

## COUNT V: RESPONDEAT SUPERIOR

106.

Plaintiff hereby realleges and reincorporates every paragraph, allegation and count of this Complaint contained in paragraphs 1 through 102 as if fully set forth herein.

107.

During all times relevant to the instant claim, Drs. Malloy and Fuller, Capt.

Clausen, Lt. Col. Trebotti, Capt. Mullette, Sgt. Carr, the two social workers and any and all other relevant personnel were employees of the United States Government, acting within the scope of their offices and employment, under circumstances where the United States, if a private person, would be liable to the Plaintiff in accordance with the laws of the State of Georgia.

### 108.

The negligent acts and omissions of the various Army personnel, as described above, were committed under the express authority granted them by virtue of their agency and/or employment relationship with Defendant United States of America.

### 109.

The negligent acts and omissions of the various Army personnel were committed while accomplishing tasks authorized by Defendant United States.

### 110.

Defendant United States of America is therefore liable to the Plaintiff under the Federal Tort Claims Act and the theory of *Respondeat Superior*, for the negligent acts and omissions of their agents and/or employees, as such acts were committed in the course and scope of their agency and/or employment with the United States of America, and proximately caused the Plaintiff's injuries.

## COUNT IV: DAMAGES

### 111.

Plaintiff hereby realleges and reincorporates every paragraph, allegation and count of this Complaint contained in paragraphs 1 through 107 as if fully set forth herein.

### 112.

As a result of the aforementioned negligence of the various Army personnel, The United States of America is liable for the personal injuries and general pain and suffering of Ms. Davis and McKenzie.

### 113.

As a direct and proximate result of the negligence of the employees described above, McKenzie and Ms. Davis have incurred extensive medical expenses and other losses.  To date, McKenzie has suffered well over one million dollars in medical expenses from Scottish Rite Hospital alone.

### 114.

As a result thereof, Plaintiff is entitled to recover compensatory damages for the general pain and suffering caused Ms. Davis as determined by the enlightened conscience of an impartial jury.

115.

As a result thereof, Plaintiff is entitled to recover compensatory damages for the general pain and suffering caused McKenzie as determined by the enlightened conscience of an impartial jury.

116.

As a result thereof, Plaintiff is entitled to recover compensatory damages for the general pain and suffering caused Ms. Davis as determined by the enlightened conscience of an impartial jury.

117.

Plaintiff brings this action to recover judgment against the Defendants in such sums as may constitute fair compensation for the injuries and damages described above, and as such Plaintiff demands judgment in the amount of $15,000,000.00.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays as follows:

(a)    That the Defendant be served with summons and process and be required to answer this lawsuit;

(b)    That Plaintiff recovers recompensive damages from the Defendant for special damages, mental and physical pain and suffering and all

general damages in an amount of $15,000,000.00; and

(c)     For any such other and further relief as the Court may deem just and appropriate including, but not limited to, the cost of any and all unforeseen medical expenses which have occurred since the time of filing of the administrative claim.

Respectfully submitted this the 13th day of April, 2011.

WEINSTOCK & SCAVO, P.C.

By: /s/ JAN P. COHEN
Jan P. Cohen, Esq.
Georgia Bar No. 174337
Matthew C. Richardson, Esq
Georgia Bar No. 109506

*Attorneys for Plaintiff*
3405 Piedmont Road, N.E.
Suite 300
Atlanta, Georgia  30305
P: (404) 231-3999
F: (404) 231-1618

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Civil Local Rules of Practice for the United States District Court for the Northern District of Georgia, this is to certify that the foregoing PLAINTIFF'S COMPLAINT complies with the font and point selections approved by the Court in Local Rule 5.1C.  The foregoing was prepared using Times New Roman font (14 point).

Respectfully submitted this the 13th day of April, 2011.

WEINSTOCK & SCAVO, P.C.

By: /s/ JAN P. COHEN
   Jan P. Cohen, Esq.
   Georgia Bar No. 174337
   Matthew C. Richardson, Esq.
   Georgia Bar No. 109506

*Attorneys for Plaintiff*
3405 Piedmont Road, N.E.
Suite 300
Atlanta, Georgia  30305
P: (404) 231-3999
F: (404) 231-1618